# EXHIBIT "A"

# AGREEMENT FOR PURCHASE AND SALE

THIS AGREEMENT FOR PURCHASE AND SALE ("Agreement") dated as of the "Effective Date" (as hereinafter defined) by and between LDG SOUTH, LLC, a Florida limited liability company ("Seller"), and AGR TM, L.L.C., a Delaware limited liability company, its successors and/or assigns ("Buyer").

WHEREAS, Seller owns certain real and personal property in the Torino and Miramonte Developments within Grey Oaks in the city of Naples, County of Collier ("County"), Florida;

WHEREAS, On October 22, 2009, Seller commenced case No. 9:09-bk-24038-ALP (the "**Bankruptcy Case**") as debtor and debtor-in-possession under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") with the United States Bankruptcy Court for the Middle District of Florida (the "Bankruptcy Court");

WHEREAS, Seller acknowledges that Buyer holds valid, perfected, first priority security interests and liens in and to all of the Property (as defined below) to secured indebtedness in the principal amount of approximately $18,941,761.21, which secured indebtedness arises from or is evidenced by, among other things, (a) the loan (the "Loan") obtained by Seller on or about March 25, 2005 from Bank of America, N.A. ("BOA"), and the related Promissory Note (Renewal) dated as of March 25, 2008 in the principal sum of $27,000,000 (the "Note") and certain other loan, mortgage and security documents (collectively, the "Loan Documents") and (b) the prior assignment by BOA to Buyer of all of BOA's right, title and interest in the Loan and Loan Documents.

WHEREAS, Buyer has proposed to acquire the Property in exchange for a credit bid of $11,800,000.00, which amount can be increased in Buyer's sole discretion, in respect of a portion of Seller's obligations under the Loan Documents (the "Credit Bid") on the terms set forth in this Agreement.

WHEREAS, Seller desires to sell to the Buyer the Property and have the Buyer assume the Assumed Liabilities (as defined below), and the Buyer desires to purchase from the Seller the Property and assume from the Seller the Assumed Liabilities, in each case upon the terms and subject to the conditions contained in this Agreement, including obtaining an order of the Bankruptcy Court pursuant to Sections 105, 363 and 365 of the Bankruptcy Code authorizing and approving this Agreement and the transactions contemplated herein.

WHEREAS, Seller has determined that this Agreement and the transactions set forth herein are in the best interests of Seller's bankruptcy estate and creditors.

## AGREEMENT

NOW THEREFORE, in consideration of the foregoing and the representations, warranties, covenants and agreements contained in this Agreement and for other good and valuable

consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1. <u>Sale and Purchase</u>.

(a) The Seller hereby agrees to sell, transfer, assign, convey and deliver to the Buyer at the Closing, and the Buyer hereby agrees to purchase, acquire, assume and accept delivery from the Seller at the Closing (as hereinafter defined), upon the terms and subject to the conditions of this Agreement, all right, title and interest of the Seller of any nature whatsoever to and in the following assets (collectively, the "Property"), free and clear of any and all liens, claims, security interests, charges, interests or encumbrances of any and every kind, nature and description:

(i) Seller's right title and interest to any and all real property, including the real property that is part of the Torino and Miramonte developments within Grey Oaks and located in the County (the "Land") as more particularly described in <u>Exhibit A</u>, attached hereto and made a part hereof;

(ii) All buildings and improvements located on the Land, including, without limitation, four (4) model homes (any lot with a model home, together with any vacant lot being conveyed pursuant to this Agreement, the "Lots");

(iii) Title to any common areas;

(iv) All title policies, surveys, plans, plats, floor plans, brochures, soil tests, engineering studies, environmental studies, aerial photographs, and all other documents, studies, licenses, permits, certificates of occupancy, zoning, authorizations, approvals, and other intangible rights pertaining to the ownership and operation of the Land in Seller's possession including, but not limited to, warranties and guaranties pertaining to the Land, the improvements located thereon and the Personal Property, subdivision plat, site plans, engineering plans, specifications and studies, if any (collectively, the "Documents");

(v) All strips and gores of land adjacent to the Land, together with all easements, privileges, riparian and other water rights, lands underlying any adjacent streets or road, areas to be vacated, and any tenements, hereditaments and appurtenances pertaining to or accruing to the benefit of the Land, if any;

(vi) An irrevocable license to use any of Seller's site plans, plats, construction and development drawings, plans and specifications, documents, surveys, engineering, soil reports, studies, licenses and permits

(vii) All of Seller's right, title and interest in any tangible and intangible personal property (the "Personal Property"), including, without limitation, fixtures, furnishings, fittings, apparatus, appliances, vehicles, equipment and machinery and other articles of personal property;

(viii) Subject to the terms hereof, all rights under the contracts set forth in Schedule 1 (the "Assumed Contracts"), which Assumed Contracts shall be assumed by the Seller and assigned

RM:7317543:6

2

to the Buyer pursuant to Section 365 of the Bankruptcy Code, the Sale Order (as hereinafter defined) or other order of the Bankruptcy Court;

(ix)    Subject to the terms hereof, all of Seller's right title and interest in the leases, licenses and other agreements for the occupancy of the within the improvements located on the Property;

(x)    All water, sewer and other utility services and contractual rights and other governmental approvals, impact fee credits, development orders and permits, including, but not limited to, any prepaid impact credits, access, service, recreational or other fees of any kind pertaining to the Land;

(xi)    All of Seller's rights as "Declarant" under the Declaration of Neighborhood Covenants for Torino at Grey Oaks Neighborhood recorded May 5, 2005, in Official Records Book 3791, Page 1311 ("Torino Declaration"), and under the Declaration of Neighborhood Covenants for Miramonte at Grey Oaks Neighborhood recorded May 5, 2005, in Official Records Book 3791, Page 1359 ("Miramonte Declaration"), both of the Public Records of the County, without Buyer having any liability for past actions of Seller as Declarant; and

(xii)    All governmental licenses, approvals, permits, and other authorizations relating to the Property.

(b)    Nothing herein contained shall be deemed to sell, transfer, assign, convey or deliver the Excluded Assets (as hereinafter defined) to the Buyer, and the Seller is not selling, transferring, assigning, conveying or delivering and shall retain all of its right, title and interest to and in the Excluded Assets and the Buyer shall have no Liability therefor. "Excluded Assets" shall mean all right, title and interest of the Seller of any nature whatsoever to and in the following assets, properties and rights:

(i)    any and all rights, interests and benefits of the Seller arising under this Agreement and all consideration deliverable or payable to or for the benefit of the Seller pursuant to the provisions hereof;

(ii)    all preference or avoidance claims and actions of the Seller, including any such claims and actions arising under Sections 544, 547, 548, 549, and 550 of the Bankruptcy Code;

(iii)    any employment agreement, collective bargaining agreement, employee benefit plan, arrangement, practice or agreement whatsoever in respect of Seller's employees;

(iv)    (A) any documents (including books and records) that the Seller is required (or reasonably believes to be required) by applicable law to retain, and (B) minute books and other corporate books and records to the extent relating to the organization and existence of and actions by the Seller, (collectively, the "Excluded Books and Records"), provided, however, the Seller shall provide a copy of all Excluded Books and Records used by the Seller in connection with, or relating to, the Property or the Assumed Liabilities;

(v)     subject to Section 14, all of the Seller's insurance policies;

(vi)     any prepaid property tax attributable to the period prior to the Closing, and any refund of taxes paid by Seller in respect of such period; and

(vii)     any capital stock or other equity interests in any other person (as defined in the Bankruptcy Code), and any securities convertible into or exchangeable or exercisable for any capital stock or other equity interests in any other person.

(c)     Pursuant to the Sale Order and to the extent permitted by applicable law, the Buyer hereby agrees to assume at the Closing, and agrees to pay, perform and discharge when due from and after the Closing, the Assumed Liabilities, in each case upon the terms and subject to the conditions of this Agreement, and from and after the Closing the Seller (and each of them) shall have no liability therefor or in connection therewith.  For purposes of this Agreement, "Assumed Liabilities" shall mean only the following liabilities (to the extent not paid at or prior to the Closing):

(i)     any liabilities with respect to the Property only to the extent such liabilities relate to the ownership or operation of the Property from and after the Closing, but, in each case, only to the extent such liabilities arise from and after the Closing;

(ii)     the liabilities of the Seller arising under the Assumed Contracts, but, in each case, only to the extent such liabilities arise from and after the Closing (it being specified, for the avoidance of doubt, that the costs required to cure defaults under such Assumed Contracts pursuant to Section 365(b) of the Bankruptcy Code shall be Assumed Liabilities regardless of when such costs arise); and

(iii)     all state and local transfer taxes, if any, occasioned by the conveyance of the Property from the Seller to the Buyer, and all costs, fees and expenses associated with the recording of the deed conveying such Property;

and excluding, for the avoidance of doubt, the Excluded Liabilities (as hereinafter defined).  For further avoidance of doubt, this Section 1(c) shall not require the Buyer to assume any liability of any person that is not the Seller.

(d)     Notwithstanding anything in this Agreement to the contrary, the Buyer shall not assume, and shall be deemed not to have assumed, any liabilities of the Seller other than the Assumed Liabilities (all such other liabilities, the "Excluded Liabilities"), and the Buyer shall have no liability therefor or in connection therewith.  For the avoidance of doubt, the Excluded Liabilities shall include, but shall not be limited to, the following:

(i)     all liabilities arising out of Excluded Assets;

(ii)     all taxes, except ad valorem real estate taxes, imposed with respect to the Property or the Assumed Liabilities for any taxable period (or portion thereof) that ends on or prior to the Closing Date;

(iii)     all taxes imposed with respect to the Excluded Assets or the Excluded Liabilities for any taxable period, and any liability of the Seller for taxes of any other person by reason of contract, assumption, transferee liability, operation of law, or otherwise;

(iv)     any liability of the Seller arising from or relating to its employment of any person;

(v)     all liabilities of the Seller arising under this Agreement;

(vi)     any liability of the Seller relating to the Property related to facts or actions occurring or accruing prior to the Closing that is not expressly included among the Assumed Liabilities;

(vii)     all liabilities of the Seller for indebtedness for borrowed money and all guarantees of obligations of any other person;

(viii)     all liabilities attributable to, relating to or arising from the period prior to the Closing relating to the Property arising (i) under applicable law (including environmental laws), or (ii) from any contract or other arrangement for disposal or treatment of Hazardous Materials, or for the transportation of Hazardous Materials for disposal or treatment, in each case including those liabilities arising from acts or omissions occurring or conditions in existence prior to the Closing; and

(ix)     any liability of the Seller not expressly included among the Assumed Liabilities or otherwise expressly assumed by Buyer under this Agreement.

2.     Purchase Price. The purchase price ("Purchase Price") payable in consideration for the sale, transfer, assignment, conveyance and delivery by the Seller to the Buyer of the Property shall consist of the following:

(a)     Eleven Million Eight Hundred Thousand and 00/100 Dollars ($11,800,000.00) (which amount the Buyer has the right to increase in its sole discretion), subject to adjustments, if any, as provided in this Agreement, of debt forgiveness evidenced by the Credit Bid, which shall become effective on the Closing Date; plus

(b)     the assumption at the Closing by the Purchaser of the Assumed Liabilities from the Seller, including the assumption of the obligation to pay to the applicable counterparties of the applicable Assumed Contracts in accordance with Section 33 of this Agreement.

3.     Survey. Buyer may, prior to the Closing, obtain a current survey (the "Survey") of the Property prepared by a registered surveyor certified to Buyer and Title Company. The Survey, if applicable, shall be in form suitable to Buyer and Title Company and shall (a) locate all present and

future easements, rights-of-way, one hundred (100)-year flood plain, roadways and encroachments on or abutting the Land, (b) contain an accurate description of the Land, (c) show the location of all title exceptions shown in the "Commitment" (as hereinafter defined), and (d) contain the certification of the surveyor. Buyer may instead update any survey or surveys which Seller had prepared.

4. <u>Title</u>. Buyer shall have the right to obtain an ALTA Owner's Title Commitment (the "Commitment"), issued by Buyer's counsel as title agent for the title insurance underwriter selected by Buyer or Buyer's counsel ("Title Company") or other title agent selected by Buyer. At Closing, the Seller shall provide the Title Company sufficient documentation to enable the Title Company to delete the preprinted gap, mechanics lien and party-in-possession exceptions in the Commitment and issue to Buyer an ALTA Form B title insurance policy issued pursuant to the Commitment insuring that Buyer has good, marketable insurable fee simple title ("Owner's Title Policy") to the Property at Closing, subject only to (i) taxes for 2009 and all subsequent years; (ii) zoning restrictions and prohibitions imposed by governmental authority; and (iii) those matters of title shown on <u>Exhibit B</u>, attached hereto and made a part hereof (the "Permitted Exceptions").

5. <u>Deed</u>. At Closing, Seller shall convey marketable fee simple title to the Property to Buyer by executing and delivering a Warranty Deed in a form reasonably acceptable to Buyer and the Title Company free and clear of all liens and encumbrances, except the Permitted Exceptions (the "Deed"). Seller agrees that from and after the Effective Date, Seller shall not enter into any other agreement or take any action concerning the Property (other than as contemplated by this Agreement) which would negatively affect the Property, unless consented to by Buyer or such agreement is terminable and shall be terminated by Seller on or before the Closing.

6. <u>Inspection</u>. At Buyer's sole expense, Buyer, its agents, employees, lender, consultant, representatives and other designees shall have access to the Property at all times subsequent to the date of execution of this Agreement and prior to any termination of this Agreement with full right to: (a) inspect the Property; and (b) to conduct reasonable tests thereon including, but not limited to, Environmental Reports and soil borings and hazardous waste studies, and to make such other examinations with respect thereto as Buyer, its counsel, licensed engineers, surveyors or other representative may deem reasonably necessary. Buyer agrees that it shall not unreasonably interfere with Seller in connection with the tests and inspections to be performed by Buyer. Any tests, examinations or inspections of the Property by Buyer and all costs and expenses in connection with Buyer's inspection in connection with the Property (or any part thereof) shall be at the sole cost of Buyer and shall be performed in a manner not to unreasonably interfere with Seller's use of the Property and shall not violate any law or regulation of any governmental authority. Upon completion of such inspection, examination or test, Buyer shall restore any permanent damage to the Property caused by Buyer to substantially its condition existing as of the Effective Date. Buyer shall not permit any liens to be placed against any portion of the Property, arising from any action of Buyer and if any liens are placed on any portion of the Property, Buyer shall promptly remove such lien by payment or bonding same in a manner required under the Governing Law so that same is no longer a lien on any portion of the Property. Buyer hereby agrees that prior to the Closing of the Property, neither Buyer nor any of its counsel, engineers, surveyors or other representatives shall have the right to place any liens against such Property and that the Buyer shall notify all persons providing services, labor or material on behalf of the Buyer that such party shall look solely to the Buyer and that until

Buyer shall acquire such Property, such Property shall not be subject to any lien as the result of the Buyer's failure to pay for any such services, labor and/or material. Buyer and its employees, agents and contractors shall enter on the Property at their own risk, and Seller shall not be liable in any way for any damage or act suffered by such parties.

Buyer hereby indemnifies and holds Seller forever harmless from and against any and all loss, damage, judgments, claims and threats of claims, including all reasonable attorneys' fees and court costs through all trial and appellate levels, in connection with any injury to persons or property from Buyer's inspections of the Property or in connection with any liens or claims of lien against the Property or any part thereof arising out of Buyer's inspections or tests of the Property contemplated by this Agreement; provided, however, the Buyer shall not be required to remove any hazardous waste which it discovers upon any of the Property in connection with its inspections, provided that the Buyer did not cause such hazardous waste to be located upon such Property.

Within five (5) days of the Effective Date, the Seller shall provide to Buyer copies of all Documents, contracts, leases, plans and specifications, surveys, reports, studies, insurance policies and such other documents and information within Seller's or its consultants' possession as it or they may have in connection with the Property. During the term of this Agreement, the Buyer shall have the right to contact such governmental and quasi-governmental authorities as Buyer may desire in connection with its due diligence and/or in connection with attempting to obtain governmental approvals pertaining to the Property. Seller will make copies or provide originals of all materials and files in its possession or its consultants' files pertaining to the Property to Buyer. [Buyer does not have the right to terminate this Agreement because of the inspection].

The provisions of this Paragraph shall survive any termination of this Agreement.

7. <u>Seller's Representations, Warranties and Covenants</u>.

a. Seller covenants, represents and warrants to Buyer as follows, to wit:

(i) Seller is a limited liability company organized and validly existing and in good standing under the laws of the State of Florida. This Agreement is subject to entry of the approval of the Bankruptcy Court by entry of the Sale Order by the Bankruptcy Court in the Bankruptcy Case, which the Seller agrees to diligently pursue in good faith. This Agreement and all documents executed by Seller which are to be delivered to Buyer are, or at the time of the Closing will be, duly authorized, executed, and delivered by Seller and do not, and at the time of the Closing will not, violate any provisions of any material agreement or judicial order--subject to Seller obtaining the Sale Order contemplated by this Agreement-- to which Seller is a party or to which Seller or the Property is subject. The Seller shall provide the Title Company with such documents as the Title Company may request to evidence that Seller is duly authorized by the Bankruptcy Court and otherwise to consummate the transaction contemplated hereunder.

(ii) This Agreement has been duly and validly executed and delivered by Seller and this Agreement constitutes the valid and legally binding obligation of Seller, enforceable

against Seller in accordance with its terms subject to entry of the Sale Order by the Bankruptcy Court.

(iii)     Seller is a "United States person" within the meaning of the Internal Revenue Code of 1986, as amended.

(iv)     To the best of Seller's actual knowledge, without independent investigation, there is no "Hazardous Material" (as hereinafter defined) on, under or about the Property. Seller further warrants and represents that during the time in which Seller owned or controlled the Property, neither Seller nor, to the best of Seller's knowledge, any third party has used, generated, manufactured, produced, stored, or disposed of on, under, or about the Property or transported to or from the Property any Hazardous Materials. To Seller's knowledge, there is no proceeding or inquiry by any governmental authority with respect to the presence of Hazardous Materials on the Property or the migration of Hazardous Materials from or to the Property. To Seller's knowledge, there are no and have not been any storage tanks located in or under the Property. The term "Hazardous Material" means, but is not limited to, any substance, material, or waste which is toxic, ignitable, reactive, or corrosive; which is or can be injurious to the health, safety, or welfare of the public or environment, and which is or becomes regulated by any local or state governmental authority or the United States Government which term includes, without limitation, any material or substance which is (i) defined as a "hazardous waste," "extremely hazardous waste," "restricted hazardous waste," "hazardous substance," "pollutant or contaminant," or "hazardous material," by any local or state law, (ii) oil and petroleum products and their by-products, (iii) asbestos or asbestos-containing materials, (iv) designated as a "hazardous substance" pursuant to the Federal Water Pollution Control Act, (v) defined as a "hazardous waste" pursuant to the Federal Resource Conservation and Recovery Act, or (vi) defined as a "hazardous substance" pursuant to the Comprehensive Environmental Response, Compensation and Liability Act. Seller has disclosed to Buyer in writing all information in Seller's possession or control which relates to the environmental condition of the Property. During the term of this Agreement, Buyer shall have the right to make such studies and investigations as it deems appropriate to evaluate the Property and risks from any environmental or hazardous material and chemicals standpoint. To the extent the environmental studies show any hazardous materials affecting the Property or any violation of any governmental requirement pertaining to hazardous materials then either (i) Seller shall agree in writing to remediate any Hazardous Material on the Property in accordance with all applicable legal requirements prior to Closing, as such Closing Date may be extended by mutual written agreement of Seller and Buyer for such period of time as Seller and Buyer shall agree upon in writing, or (ii) the Buyer may proceed to Closing and the Seller and Guarantors (as hereinafter defined) shall reimburse Buyer and all directors, officers, shareholders, affiliates, members, managers, partners, employees and agents of Buyer (each, a "Purchaser Indemnified Party") for all costs incurred in order to remediate the Hazardous Material. Seller hereby agrees to defend, indemnify and hold harmless, and to cause Guarantors to jointly and severally defend, indemnify and hold harmless, each Purchaser Indemnified Party harmless from and against all losses, damages, costs and expenses incurred by a Purchaser Indemnified Party (including, without limitation, legal fees and disbursements) incurred by Buyer resulting from any environmental or other condition existing on the Property as of the Closing Date. The provisions of this Section shall survive the Closing.

(v)  There are no parties in possession of any portion of the Property other than Seller.

(vi)  The Land has access to paved road rights-of-way providing legal access to the Property.

(vii)  Seller is the owner of fee simple title to the Property, subject only to the Permitted Exceptions.

(viii)  There are no actions, litigations, suits, special assessments, proceedings or investigations pending or to the best of Seller's knowledge, threatened affecting the Seller or the Property in law or in equity before any governmental department, commission, board, agency or instrumentality or any private individual or entity which involved the possibility of a judgment, liability or change in zoning against the Property except the Bankruptcy Case and actions therein and thereunder.

(ix)  Between the Effective Date and Closing, the Seller will

(1)  comply fully with this Agreement;

(2)  comply with the terms and requirements of all governmental approvals relating to the Property;

(3)  keep the Property insured in accordance with Seller's existing insurance program;

(4)  maintain the Property in good order and repair, reasonable wear and tear excepted;

(5)  operate the Property substantially as operated prior to the Effective Date; and

(6)  not sell or market the Property or any portion thereof without the prior consent of Buyer, except as agreed to in the Bankruptcy Case.

(x)  No commitments have been made to any governmental authority, utility company, school board, church or other religious body or any homeowner's association or other organization, group or individual relating to the Property which would impose an obligation on Buyer, its successors and assigns, to make any contribution or dedication of money or land or to construct, install or maintain any improvement of a public or private nature on the Property.

(xi)  The Property and its operation and use is presently in compliance with all applicable governmental requirements, including, but not limited to, DRI (Development of Regional Impact), zoning, platting, concurrency requirements and land use.

(xii)    There are no condemnation, environmental, zoning, or other land use regulation proceedings instituted which could detrimentally affect the use or operation of the Property or the value of the Property, nor has Seller received notice of any special assessment proceedings affecting the Property. To the extent Seller receives any notice of any such actions or matters, the Seller shall promptly notify Buyer in writing specifying in reasonable detail the nature of such matter(s).

(xiii)    The Lots have been filled as required by all governmental authorities.

(xiv)    All subdivision improvements have been made in accordance with all governmental requirements and the models have been constructed and obtained certificates of occupancy in accordance with all governmental requirements.

(xv)    As of the date hereof and as of the Closing Date, there are no contracts or agreements pertaining to the Property or that will affect the Property or the Buyer other than the Assumed Contracts that will not be rejected as part of the Bankruptcy Case. The Seller has not and shall not commit or obligate itself in any manner whatsoever to sell the Property to any party other than Buyer.

(xvi)    The Property is not a "plan asset" as defined in the Employee Retirement Income Security Act of 1974, as amended ("ERISA") and the sale of the Property by Seller is not a "prohibited transaction" under ERISA.

(xvii)    No work stoppage exists or, to the best of Seller's knowledge, is threatened Seller or the Property. No employees of the Property will be transferred to Buyer and Buyer shall have no liability of any kind or nature in respect of any employees of the Property except to the extent, and only to the extent, that Buyer offers employment to employees of the Property after the Closing, in which event Buyer's liability shall be solely for salaries and other employment costs accruing from and after the Closing Date and Seller hereby indemnifies and holds harmless Buyer from any pre-Closing salaries and other employment costs, and costs of termination of employment, with respect to employees of the Property.

(xviii)    The buildings and other improvements on the Property are in good operating condition and repair, without structural or mechanical defects of any kind, and at Closing will be in the same condition as they are now, reasonable wear and tear excepted.

(xix)    Seller has not retained anyone to file notices of protest against, or to commence actions to review, real property tax assessments against the Property.

All information, representations and warranties of Seller to Buyer as described in this Agreement and as provided by Seller to Buyer pursuant to the provisions of this Agreement are true, correct and complete as of the Effective Date and shall be true, correct and complete as of the Closing Date. The representations and warranties of Seller pursuant to this Section 7 shall be true and correct as of the Closing and shall survive the Closing.

b.     Those individuals and entities which are guarantors ("Guarantors") of the Loan shall, as partial consideration for their release from their guaranties of the Loan (the "Loan Guaranties") by Buyer as part of the Closing of the Property, be jointly and severally absolutely and unconditionally responsible and liable for all the representations, warranties, indemnifications and other obligations of Seller contained in this Agreement, with it being understood and agreed that such guaranty shall be deemed a present and continuing guaranty of payment and performance and not of collection. Neither Guarantor's obligations hereunder nor any remedy for the enforcement thereof shall be impaired, modified, changed or released in any matter whatsoever by any impairment, modification, change, release or limitation of the liability of Seller hereunder or under the Loan Documents including if by reason of Seller's bankruptcy.  In exchange for being released from their Loan Guaranties, the Guarantors shall: (i) dismiss any appeal and other litigation in the Bankruptcy Case with prejudice; (ii) waive and release any claim against the Debtor including, but not limited to, claims based in whole or in part on any equity interest in the Debtor; (iii) release Buyer, Bank of America, N.A., and  their successors and/or assigns, affiliates and their respective officers, employees, agents and attorneys from any and all claims related to LDG South and covenant not to sue any of the foregoing in connection therewith; and (iv) provide such additional specific written undertakings as may be reasonably requested by Buyer to document their being jointly and severally liable for the representations, warranties, indemnifications and other obligations of Seller contained in this Agreement.  All of the undertakings, waivers and releases required pursuant to this Section 7.b. shall be in form and substance satisfactory to Buyer.

c.     Seller agrees to release Buyer, Bank of America, N.A., and their successors and/or assigns, affiliates and their respective officers, employees, agents and attorneys from any and all claims and covenant not to sue any of the foregoing.  The undertakings, waivers and releases required pursuant to this Section 7.c. shall be satisfactory to Buyer.

8.     Buyer's Representations, Warranties and Covenants.  Buyer covenants, represents and warrants unto Seller as follows, to wit:

(a)     Buyer has all necessary power and authority to enter into this Agreement and perform all of the obligations to be performed by the Buyer hereunder.

(b)     This Agreement has been duly and validly executed and delivered by Buyer, and this Agreement constitutes the valid and legal and binding obligation of Buyer, enforceable against Buyer in accordance with its terms.

(c)     The Buyer is a "United States person" within the meaning of the Internal Revenue Code of 1986, as amended.

(d)     There has not been filed by or against Buyer a petition in bankruptcy or insolvency, proceeding or for reorganization or for the appointment of a receiver or trustee, nor have any such entities made an assignment for the benefit of creditors or filed a petition or arrangement or entered into an arrangement with creditors or admitted in writing its inability to pay its or their debts as they become due.

(e)     As of the date hereof, Buyer is the owner and holder of the Loan, Note, and Loan Documents.

The warranties of Buyer set forth in this Paragraph 8 shall be true and correct as of the Closing and shall survive Closing.

9.     Closing Date.

(a)     The Closing of title for the Property shall take place at the offices of the title agent for the Title Company or such other location in the County as Buyer may reasonably designate upon five (5) Business Days' advance notice to Seller, commencing at 10:00 a.m. on the date which, unless otherwise designated, shall be not later than sixty (60) days after the date the Bankruptcy Court enters the Sale Order pursuant to this Agreement ("Closing Date").

(b)     The obligation of Buyer to consummate the transactions contemplated by this Agreement are subject to the satisfaction of the following conditions precedent:

(i)     Seller shall have performed or observed all of its obligations under this Agreement;

(ii)     the representations and warranties of Seller contained in this Agreement shall be true, correct and accurate on the Closing Date in all material respects;

(iii)     Seller shall have delivered all documents and instruments required to be delivered by Seller pursuant to the provisions of this Agreement, including but not limited to the undertaking of the Guarantors required pursuant to this Agreement;

(iv)     Buyer shall have received the Title Commitment from the Title Company in compliance with the requirements of <u>Section 4</u> hereof, which shall (i) show no exceptions other than the Permitted Exceptions and (ii) contain such endorsements as are requested by Buyer;

(v)     Buyer shall have received the Survey in compliance with the requirements of <u>Section 3</u> hereof, which shall contain such certifications as are requested by Buyer;

(vi)     the title to the Property shall be conveyed to Buyer subject solely to the Permitted Exceptions;

(vii)     Buyer shall have confirmed that no person has any written or oral right to remain in possession of any portion of the Property after the Closing Date; and

(viii)     the Bankruptcy Court shall have entered the Sale Order.

10.     Closing Costs and Documents.

(a)     On or before Closing, Seller shall pay for the following Closing costs in connection with this transaction: (i) the cost associated with obtaining, preparing and recording any correcting instruments in connection with title to the Property; (ii) the cost to perform the obligations of Seller as set forth in this Agreement; and (iii) the payment of its attorneys' fees, except as provided in Paragraph 11.

(b)     On or before Closing, the Buyer shall pay (i) the cost to record the Deed; (ii) the costs and expenses incurred by Buyer in connection with the search fees to obtain the Commitment; (iii) the Survey, if one is obtained; (iv) the cost of the Owner's Title Insurance at promulgated rate; (v) the cost of documentary stamps, surtax or other transfer taxes required in connection with the conveyance of the Property; and (vi) the Buyer shall pay its own attorneys' fees, except as provided in Paragraph 11.

(c)     At Closing, the Seller shall execute and/or deliver, as applicable, to Buyer: (i) the Deed subject only to the Permitted Exceptions; (ii) assignments/bill of sale transferring to Buyer the permits, approvals, credits for impact fees, all other governmental authorizations and other personal property, free and clear of all liens, claims and encumbrances; (iii) a closing affidavit and other title documentation as made be reasonably required by the Title Company to issue its Owner's Policy subject only to the Permitted Exceptions; (iv) appropriate authorizations authorizing the Seller to convey the Property; (v) original or certified copies of all Documents; (vi) transfers of permits and applications in the form required by all applicable governmental authorities; (vii) assignment of Declarant's rights under the Torino Declaration and the Miramonte Declaration without Buyer receiving any liability for actions occurring prior to the Closing in such form as shall be reasonably prepared by Buyer; (viii) the certificate of good standing from the Florida Secretary of State; and (ix) an undertaking from each Guarantor as required by section 7(b)(iv) hereof.

(d)     At Closing, Buyer shall deliver the general release of the Guarantors subject to the obligations being assumed by the Guarantors, provisions of this Agreement and all other consideration and documents contemplated by this Agreement to be provided by Buyer.

(e)     All utility charges and homeowners association charges shall be prorated as of the Closing Date.

11.     Default.

(a)     If Buyer is in material default in any of the terms, covenants and provisions of this Agreement on the part of Buyer to be performed, if prior to Closing then Seller shall have the right to terminate this Agreement whereupon this Agreement shall terminate, and the parties shall be released of all further obligations each to the other under this Agreement and if after Closing Seller may exercise any remedies available to it in law or equity.

(b)     If Seller shall default in any of the terms, covenants and/or provisions of this Agreement on the part of Seller to perform, Buyer may exercise any remedies available to it in law or

equity including the right to seek an action for specific performance and/or to terminate this Agreement and enforce the Loan Documents.

(c)     Prior to Seller and Buyer exercising their respective remedies set forth above, the other party shall provide the defaulting party with notice and seven (7) days opportunity to cure prior to enforcing its remedies set forth in this Agreement.

(d)     The parties further agree that in the event it becomes necessary for either party to litigate in order to enforce its rights under the terms of this Agreement, then, and in that event, the prevailing party shall be entitled to recover reasonable attorneys' fees and the costs of such litigation, including appellate and post-judgment litigation.

12.     Escrow Agent.  It is agreed that the duties of the Escrow Agent are only as herein specifically provided and purely ministerial in nature, and the Escrow Agent shall incur no liability whatever except for willful misconduct or gross negligence.  The Seller and Buyer each release the Escrow Agent from any act done or omitted to be done by the Escrow Agent in the performance of its duties hereunder, except the parties shall not release Escrow Agent from willful misconduct or gross negligence.

The Escrow Agent is acting as stakeholder only with respect to the Deposit and any other monies or documents to the extent delivered to Escrow Agent pursuant to this Agreement.  The Escrow Agent agrees that at such time as either party alleges that there is a default entitling the other party to the Deposit, then the Escrow Agent shall send notice to the Buyer and Seller advising that the other party has made demand on the Escrow Agent for such Deposit.  In the event Escrow Agent receives instructions to disburse the Deposit in accordance with the provisions of this Agreement, the Escrow Agent shall notify the Buyer and Seller of such instructions ("Notification"), whereupon unless the other party shall object in writing to Escrow Agent within ten (10) days of Escrow Agent's delivery of the Notification, then the Escrow Agent is hereby authorized and instructed to disburse the Deposit in accordance with the Notification. If there is any valid dispute as to whether the Escrow Agent is obligated to deliver the Deposit or the cash or documents to close or as to whom the Deposit or cash or documents to close is to be delivered, the Escrow Agent shall not make any delivery, but in such event, the Escrow Agent shall hold same until receipt by it of an authorization in writing, directing the disposition of same executed by Seller and Buyer; or in the absence of such authorization, the Escrow Agent shall hold the Deposit and/or the cash or documents to close until final determination of the rights of the parties in the appropriate proceedings.  If such written authorization is not given or proceedings for such determination are not begun within thirty (30) days of written demand by Escrow Agent to Seller and Buyer and diligently continued, the Escrow Agent may bring an appropriate action or proceeding to interplead such deposits.  Any such interpleader action must be brought in Collier County, Florida.  The Escrow Agent shall be reimbursed for all costs and expenses of such action or proceeding, including, without limitation, reasonable attorneys' fees and disbursements, including for its own time, which obligations may be deducted from the Deposit and which obligations shall be joint and several obligations of both parties.  Such fees and costs shall be considered costs owed by the non-prevailing party to the prevailing party.   Upon making delivery of the Deposit and/or the cash or documents to close, the Escrow Agent shall have no further liability unless such delivery constituted willful misconduct or gross negligence.  The

parties acknowledge that the Escrow Agent is counsel to Seller and can represent Seller and/or itself hereunder in the event of any dispute hereunder, concerning the monies or documents which Escrow Agent is holding or otherwise, and Buyer waives any right to object to same.

Any interpleader action must be brought in the Bankruptcy Court if applicable; otherwise, such action must be brought in Collier County, Florida.

The provisions of this Paragraph shall survive any termination of this Agreement.

13.     Notices.  Any notice required or permitted to be given by the terms of this Agreement or under any applicable law by either party shall be in writing and shall be hand delivered, sent by certified mail, postage prepaid, return receipt requested, Federal Express (or other recognized courier service) or via facsimile with confirmation.  Such written notice shall be addressed to the parties as set forth in the below unless the address or fax number is changed by the party by like notice given to the other parties.  Notice shall be in writing, mailed certified mail, return receipt requested, postage prepaid and shall be deemed delivered three (3) days after mailing, upon hand delivery to the address indicated, next Business Day if Federal Express or other overnight courier or when sent by facsimile when received as evidenced by confirmation if during a Business Day prior to 5:00 p.m. otherwise on the next Business Day.  Notices sent by legal counsel for either Buyer or Seller shall constitute the notice of the party for which such legal counsel is acting.

|  | |
|---|---|
| If to Seller: | LDG South |
| | Attention:  Michael S. Diamond |
| | The Newport Companies, LLC |
| | 5692 Strand Court |
| | Naples, Florida 34110 |
| | Phone:  239-325-2300 |
| | Fax:  239-325-2188 |
| | Email:  MDiamond@newportswfl.com |
| | |
| With copy to: | Stichter Riedel Blain & Prosser P.A. |
| | Attention:  Stephen R. Leslie, Esq. |
| | 110 East Madison Street |
| | Suite 200 |
| | Tampa, Florida 33602 |
| | Phone:  813-229-0144 |
| | Fax:  813-229-1811 |
| | Email:  SLeslie@srbp.com |
| | |
| If to Buyer: | AGR TM, L.L.C. |
| | c/o Angelo, Gordon |
| | 245 Park Avenue |
| | 26th Floor |
| | New York, NY 10167 |

| | |
|---|---|
| | Attention: Ronen Katz |
| | Phone: 212-883-4191 |
| | Fax: 212-867-5436 |
| | Email: RKatz@angelogordon.com |
| | |
| And: | The Ronto Group, Inc. |
| | 3185 Horseshoe Drive South |
| | Naples, Florida 34104 |
| | Attention: A. Jack Solomon |
| | Telephone:    (239) 649-6310 |
| | Facsimile:     (239) 649-8870 |
| | |
| With copy to: | Duval & Stachenfeld LLP |
| | 101 Park Avenue |
| | 11th Floor |
| | New York NY 10178 |
| | Attention: Terri L. Adler, Esq. |
| | Phone: 212-692-5533 |
| | Fax: 212-883-8883 |
| | Email: tadler@dsllp.com |
| | |
| With copy to: | Ruden, McClosky, Smith, Schuster & Russell, P.A. |
| | Attention: John L. Farquhar, Esquire |
| | 5150 N. Tamiami Trail, Suite 502 |
| | Naples, Florida 34103 |
| | Telephone:    (239) 659-1100 |
| | Facsimile:     (954) 333-4037 |
| | Email: John.Farquhar@ruden.com |
| | |
| If to Escrow Agent: | Stephen R. Leslie, Esq. |
| | Stichter Riedel Blain & Prosser P.A. |
| | 110 East Madison Street |
| | Suite 200 |
| | Tampa, Florida 33602 |
| | Phone: 813-229-0144 |
| | Fax: 813-229-1811 |
| | Email: SLeslie@srbp.com |

14.    <u>Casualty or Condemnation</u>.  Should any governmental entity having the power of condemnation initiate eminent domain proceedings prior to the Closing Date to condemn any portion of the Property or there is a casualty as to all or any portion of the Property Seller shall promptly notify Buyer of such occurrence and Seller shall assign to Buyer any condemnation proceeds payable to Seller with respect to the Property or all insurance proceeds payable with respect to the Property, as applicable, provided that if the damage caused a casualty is completely repaired by Seller (at its

expense) prior to Closing Date to the satisfaction of Buyer, Seller shall be under no obligation to assign any insurance proceeds.

15. <u>Further Assurances</u>. Each party will promptly execute and deliver any and all written further assurances that are necessary, convenient, or desirable to evidence, complete or perfect (or any combination thereof) the transactions contemplated by this Agreement, so long as no further assurance operates to impose any new or additional substantial liability upon any party. The parties will so perform all other acts that are reasonably necessary, convenient, or desirable for any such purpose, so long as no substantial new or additional liabilities are incurred.

16. <u>Assignability</u>. This Agreement may be assigned by Buyer without the prior written consent of Seller.

17. <u>No Recording</u>. Except in connection with a lis pendens filed in connection with a lawsuit for specific performance of this Agreement, Buyer shall not record this Agreement or any memorandum of its terms without Seller's prior written consent.

18. <u>Time is of the Essence</u>. For purposes herein, the parties agree that time shall be of the essence of this Agreement.

19. <u>Captions and Paragraph Headings</u>. Captions and paragraph headings contained in this Agreement are for convenience and reference only and in no way define, describe, extend or limit the scope or intent of this Agreement, nor the intent of any provision hereof.

20. <u>No Waiver</u>. No waiver of any provision of this Agreement shall be effective unless it is in writing, signed by the party against whom it is asserted and any such written waiver shall only be applicable to the specific instance to which it relates and shall not be deemed to be a continuing or future waiver.

21. <u>Counterparts</u>. This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original, but all of which shall constitute one and the same Agreement. Facsimile transmission or other copies of execution pages of this Agreement or any amendments of this Agreements or notices pursuant this Agreement shall constitute original execution documents for purposes of this Agreement or any such amendment or notice.

22. <u>Binding Effect</u>. Subject to approval of the Bankruptcy Court, which the parties agree in good faith to diligently pursue, this Agreement shall inure to the benefit of and shall be binding upon the parties hereto and their respective heirs, personal representatives, successors and assigns.

23. <u>Governing Law</u>. This Agreement shall be construed and interpreted according to the laws of the State of Florida and venue with respect to any litigation shall be exclusively in Collier County, Florida unless it is covered by the Bankruptcy Case.

24. <u>Gender</u>. All terms and words used in this Agreement regardless of the number and gender in which used, shall be deemed to include any other gender or number as the context or the use thereof may require.

RM:7317543:6

25.     Entire Agreement and Modification.  This Agreement contains and sets forth the entire understanding between Seller and Buyer, and it shall not be changed, modified or amended except by an instrument in writing and executed by the party against whom the enforcement of any such change, modification or amendment is sought.  The provisions of this Agreement shall survive Closing unless otherwise specified.

26.     Relationship.  Nothing contained in this Agreement shall constitute or be construed to be or create a partnership, joint venture or any other relationship between Seller and Buyer other than the relationship of a buyer and seller of real property as set forth in this Agreement.

27.     Joint Preparation.  The preparation of this Agreement has been a joint effort of the parties and the resulting documents shall not, solely as a matter of judicial construction, be construed more severely against one of the parties than the other.

28.     Severability.  If any provisions of this Agreement are held to be invalid, void or unenforceable, the remaining provisions of this Agreement shall not be affected or impaired and each remaining provision shall remain in full force and effect.  In the event that any term or provision of this Agreement is determined by appropriate judicial authorities to be illegal void or otherwise invalid, said provision shall be given its nearest legal meaning or be construed as deleted as such authority determines and the remainder of this Agreement shall be construed to be in full force and effect.

29.     Business Day.  The term "Business Day" shall mean Monday through Friday, other than days which are state or national holidays in the United States of America and/or the State of Florida.  In the event that the Closing Date, Review Date, Title Cure Date, Inspection Completion Date, or other date for performance shall end on a day which is not a Business Day, then such date for performance or requirement to pay a Deposit shall be extended until the next Business Day thereafter occurring.

30.     Effective Date.  The term "Effective Date" as used herein shall be the date on which the last of Buyer and Seller signs this Agreement and delivers a fully-executed copy of same to the other party subject to entry of the Sale Order by the Bankruptcy Court.

31.     Bid Protections.  Buyer and the Seller acknowledge that the Seller must take reasonable steps to demonstrate that it has sought to obtain the highest or best offer for the Property, including giving notice thereof to the creditors of the Seller and other interested parties, providing information about the Property to prospective bidders (subject to confidentiality agreements), entertaining higher or better qualified offers from such prospective bidders, and, in the event that additional qualified prospective bidders desire to bid for the Property, conducting an auction.  As a result, the Parties agree to the bidding procedures annexed hereto as Exhibit C (the "Bidding Procedures").  The Seller and the Buyer agree, and the Sale Order shall reflect the fact that, the provisions of this Agreement are reasonable, were a material inducement to Buyer to enter into this Agreement and are designed to achieve the highest or best offer for the Property.

32.     The Sale Procedures Motion and Order. Within two business days of the date of this Agreement, the Seller shall file a motion with the Bankruptcy Court in the form of Exhibit D (the "Sale Procedures Motion") hereto seeking the entry of an order (the "Sale Procedures Order") approving the Bidding Procedures, the form and manner of providing notice of the hearing to consider entry of a Sale Order, and such other relief that is in form and substance satisfactory to Buyer. The Seller will use its reasonable best efforts to cause the Bankruptcy Court to enter the Sale Procedures Order as soon as practicable after the filing of the Sale Procedures Motion, and to cause such Sale Procedures to become final and non-appealable.

33.     The Hearing and the Sale Order. The Seller shall use its reasonable best efforts to have the Hearing scheduled no later than June 10, 2010; provided, however, if the Hearing has not been scheduled by June 30, 2010, the Buyer has the right to terminate this Agreement pursuant to Section 11(b). At the Hearing, if the Buyer is the successful bidder in the Auction (as defined in the Bidding Procedures), the Seller shall seek the entry of the Sale Order. As used herein, the term "Sale Order" shall mean a final, non-appealable order of the Bankruptcy Court, in form and substance satisfactory to Buyer, which shall:

(a)     approve this Agreement and the consummation of the sale and purchase transaction contemplated herein upon the terms and subject to the conditions of this Agreement;

(b)     find that, as of the Closing Date, the transactions contemplated by this Agreement effect a legal, valid, enforceable and effective sale and transfer of the Property to and the assumption of the Assumed Liabilities by the Buyer and shall vest the Buyer with title to the Property free and clear of all liens and encumbrances, other than Permitted Exceptions;

(c)     find that the consideration provided by the Buyer pursuant to this Agreement constitutes reasonably equivalent value and fair consideration for the Property;

(d)     (i) authorize the Seller to assume and assign to the Buyer each of the Assumed Contracts and (ii) find that, as of the Closing Date, the Assumed Contracts to be assumed by the Seller and assigned to the Buyer pursuant to this Agreement will have been duly assigned to the Buyer in accordance with Section 365 of the Bankruptcy Code;

(e)     find that the Buyer is a good faith purchaser of the Property pursuant to Section 363(m) of the Bankruptcy Code;

(f)     find that the Buyer did not engage in any conduct that would cause or permit this Agreement or the consummation of the transactions contemplated hereby to be avoided, or costs or damages to be imposed, under Section 363(n) of the Bankruptcy Code;

(g)     order that the Assumed Contracts will be transferred to, and remain in full force and effect for the benefit of, the Buyer, notwithstanding any provision in any such contract or any requirement of applicable law (including those described in Sections 365(b)(2) and (f) of the Bankruptcy Code) that prohibits, restricts or limits in any way such assignment or transfer;

(h)     approve any other agreement to the extent provided by this Agreement;

(i) find that the Seller gave due and proper notice of the proposed sale of the Property to each party entitled thereto;

(j) find that the Buyer has satisfied all requirements under Sections 365(b)(1) and 365(f)(2) of the Bankruptcy Code to provide adequate assurance of future performance of the Assumed Contracts;

(k) enjoin and forever bar the non-debtor party or parties to each Assumed Contract from asserting against the Buyer or any of the Property: (a) any default, claim, liability or other cause of action existing as of the Closing Date whether asserted or not and (b) any objection to the assumption and assignment of such non-debtor party's Assumed Contract;

(l) find that the Buyer is not a successor to Seller or its bankruptcy estate by reason of any theory of law or equity, and the Buyer shall not assume or in any way be responsible for any liability of Seller and/or its bankruptcy estate, except as otherwise expressly provided in this Agreement;

(m) made expressly binding (based upon language satisfactory to the Buyer) upon any United States bankruptcy court or trustee in the event of conversion of the Seller's chapter 11 case to chapter 7, appointment of a chapter 11 trustee in the Seller's chapter 11 case, or transfer of venue of the Seller's chapter 11 case to a bankruptcy court other than the Bankruptcy Court; and

(n) order that, notwithstanding the provisions of Federal Rules of Bankruptcy Procedure 6004(h) and 6006(d), the Sale Order is not stayed and is effective immediately upon entry.

(o) order rejecting all of the Executory Contracts listed in this Agreement.

34. <u>Rejection of Executory Contracts</u>. The following executory contracts ("Executory Contracts") of the Seller shall be rejected:

(a) That certain Grey Oaks Brokerage and Marketing Agreement with an effective date of the 20th day of February 2004, by and between LDG South, LLC, a Florida limited liability company, and Grey Oaks Realty, Inc., a Florida corporation, relating to the sale of lots within the Torino and Miramonte Neighborhoods located within Grey Oaks, Collier County, Florida.

(b) Agreement for Purchase and Sale dated the 20th day of February 2004, by and between Halstatt Partnership, a Florida general partnership, and LDG South, LLC, a Florida limited liability company, relating to the Property which is now platted as Torino and Miramonte and recorded in Plat Book 42, Page 52 (4 sheets), of the Public Records of Collier County, Florida. (Is there a way pursuant to the Bankruptcy Case as part of rejecting the above Agreement for Purchase and Sale which includes the rejection of Article X of such Agreement which is a right of first refusal to Halstatt Partnership which is cited in the Warranty Deed recorded in Official Records Book 3761, Page 2895, and also in the Warranty Deed recorded in Official Records Book 3783, Page 927, i.e., perhaps by recording the bankruptcy order rejecting the underlying provision of the contract which is recited in the above-referenced Warranty Deeds in the Public Records of the County.)

35. <u>Brokerage</u>. Buyer warrants that Buyer has not dealt with any broker in connection with the transactions contemplated hereunder. Seller warrants that Seller has not dealt with any broker in connection with the transaction contemplated hereunder. If any person or entity shall assert a claim to a finder's fee, brokerage commission or other compensation on account of alleged employment as a finder or broker or performance of services as a finder or broker in connection with the transactions contemplated hereby, the party under whom the finder or broker is claiming shall indemnify, defend, and hold harmless the other party and such party's affiliates and members, partners, shareholders, principals, directors, officers, and employees for, from and against any and all obligations, debts, covenants, conditions, representations, costs, and liabilities and any and all demands, causes of action, and claims, of every type, kind, nature or character, direct or indirect, known or unknown, absolute or contingent, determined or speculative, at law, in equity or otherwise, including attorneys' fees and litigation and court costs. in connection with such claim or any action or proceeding brought on such claim.

36. <u>Exculpation</u>. Notwithstanding anything to the contrary contained in this Agreement, no direct or indirect director, officer, employee, shareholder, member, manager, partner or agent of Buyer nor any of the directors, officers, employees, shareholders, members, managers, partners, joint venturers or agents of any of the directors, officers, employees, shareholders, members, managers, partners, joint venturers or agents of Buyer nor any other person, partnership, limited liability company, corporation, joint venture or trust, as principal of Buyer, whether disclosed or undisclosed (collectively, the "Buyer Exculpated Parties") shall have any personal obligation or liability hereunder, and Seller shall not seek to assert any claim or enforce any of Seller's rights hereunder against any Buyer Exculpated Party.

37. <u>Waiver Of Jury Trial</u>.

BUYER AND SELLER EACH HEREBY AGREES NOT TO ELECT A TRIAL BY JURY OF ANY ISSUE TRIABLE OF RIGHT BY JURY, AND WAIVES ANY RIGHT TO TRIAL BY JURY FULLY TO THE EXTENT THAT ANY SUCH RIGHT SHALL NOW OR HEREAFTER EXIST WITH REGARD TO THIS AGREEMENT OR ANY CLAIM, COUNTERCLAIM OR OTHER ACTION ARISING IN CONNECTION THEREWITH. THIS WAIVER OF RIGHT TO TRIAL BY JURY IS GIVEN KNOWINGLY AND VOLUNTARILY BY BUYER AND SELLER, AND IS INTENDED TO ENCOMPASS INDIVIDUALLY EACH INSTANCE AND EACH ISSUE AS TO WHICH THE RIGHT TO A TRIAL BY JURY WOULD OTHERWISE ACCRUE. SELLER OR BUYER, AS APPLICABLE, IS HEREBY AUTHORIZED TO FILE A COPY OF THIS SECTION IN ANY PROCEEDING AS CONCLUSIVE EVIDENCE OF THIS WAIVER BY BUYER OR SELLER, AS APPLICABLE.

38. <u>Seller Indemnification</u>. Seller hereby agrees to defend, indemnify and hold Purchaser Indemnified Parties harmless from and against all losses, damages, costs and expenses incurred by a Purchaser Indemnified Party (including, without limitation, legal fees and disbursements) incurred by Purchaser arising out of any matter or thing concerning the Property that arises prior to the Closing Date (other than any such matter or thing that is caused by the actions of a Purchaser Indemnified Party), including, without limitation (a) any matter or thing pertaining to the operation of the Property prior to the Closing Date, (b) any litigation, action or proceeding based on actions or events

occurring prior to the Closing Date, and (c) any environmental or other condition existing on the Property as of the Closing Date. The provisions of this <u>Section 38</u> shall survive the Closing.

39. <u>Incorporation of Recitations</u>. The recitations set forth in the preamble of this Agreement are true and correct and are incorporated herein by this reference and made a part of this Agreement.

40. No Third Party Beneficiaries. No third party is intended to or shall have any rights hereunder.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement the day and year below.

SELLER:

LDG SOUTH, LLC
a Florida limited liability company,
as Debtor In Possession

By: _Michael S. Diamond_ (signature)
Printed Name: _Michael S. Diamond_
Title: _MANAGER_
Dated: _4/19/10_

BUYER:

AGR TM, L.L.C.
a Delaware limited liability company

    By:    AGR TM Holdings, L.L.C., a Delaware limited liability company, its sole member

    By:    AG Real Estate Manager, Inc., a Delaware corporation, its manager

By: _____
Printed Name: _____
Title: _____
Date: _____

RM:7317543:6

IN WITNESS WHEREOF, the parties hereto have executed this Agreement the day and year below.

SELLER:

LDG SOUTH, LLC
a Florida limited liability company,
as Debtor In Possession

By:_____

Printed Name:_____

Title:_____

Dated:_____

BUYER:

AGR TM, L.L.C.
a Delaware limited liability company

By:    AGR TM Holdings, L.L.C., a Delaware limited liability company, its sole member

By:    AG Real Estate Manager, Inc., a Delaware corporation, its manager

By:_____

Printed Name:   Kirk Wickman

Title:   Vice President

Date:_____

## LEGAL DESCRIPTION OF LAND

Parcel 1: Lots 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 16, 17, 24, 25, 26, 27, 28, 30 and 33 Block M; and Lots 1, 3, 4, 5, 11, 12, 13, 14, 15, 16, 17, 18, 19, 26, 27, 28, 29, 30, 31, 32, 33, 34, 35, 38, 39, 41, 42, 43, 44, 45, 46, 47, 48, 49, 50, 51, 52, 53 and 54 Block T; and all Tracts A, B, C, D, E, F, H, J, and R-1, Tract G less and excepting that portion replatted as Torino Lot 37 Replat in Plat Book 49, page 81, and Tract R-2 less and excepting that portion replatted as Torino Lot 55 Replat in Plat Book 49, page 59; all of Torino and Miramonte, according to the Plat thereof as recorded in Plat Book 42, page 51, Public Records of Collier County, Florida.

Parcel 2: Lot 55 and Tract J-2, Torino Lot 55 Replat, according to the Plat thereof as recorded in Plat Book 49, page 59, Public Records of Collier County, Florida.

Parcel 3: All that part of Section 25, Township 49 South, Range 25 East, Collier County, Florida, being more particularly described as follows: Commencing at the Southwest corner of Tract GC-14 Grey Oaks Unit Fifteen, according to the plat thereof as recorded in Plat Book 35, Pages 26-30, Public Records of Collier County, Florida;
Thence North 89°24'17" East 9.58 Feet;
Thence South 02°40'55" East 84.06 feet to the south right of way line of Grey Oaks Drive south of said unit fifteen;
Thence along said south right of way line 251.19 feet along the arc of a non-tangential circular curve concave south having a radius of 3,000.00 feet through a central angle of 04°47'50" and being subtended by a chord which bears North 87°36'05" East 251.11 feet;
Thence North 90°00'00" East 141.48 feet to the point of beginning;
Thence South 00°21'54" West 1,463.69 feet to the North line of a 110 foot wide FPL Easement as recorded in OR Book 185, Page 845, Public Records of Collier County, Florida;
Thence along the North line of said easement North 89° 38'06" West 50.00 feet;
Thence North 00°21'54" East 1,463.37 feet;
Thence North 90°00'00" East 50.00 feet to the point of beginning.

## PERMITTED EXCEPTIONS

1. Declaration of Master Covenants, Conditions and Restrictions for Grey Oaks as recorded in Official Records Book 1697, Page 1167 as re-recorded in Official Records Book 1740, Page 1760, and as amended by Supplement to Master Declaration in Official Records Book 3761, Page 2892 and Official Records Book 3783, Page 923, the Public Records of Collier County, Florida.

2. Declaration of Neighborhood Covenants for Torino at Grey Oaks Neighborhood as recorded in Official Records Book 3791, Page 1311, the Public Records of Collier County, Florida.

3. Declaration of Neighborhood Covenants for Miramonte at Grey Oaks Neighborhood as recorded in Official Records Book 3791, Page 1359, the Public Records of Collier County, Florida.

4. Subject to Right of First Refusal as to sale of all or portion of undeveloped premises described herein to any bona fide third party purchaser pursuant as an arms length transaction, being reserved by Halstatt Partnership in Deed recorded in O.R. Book 3761, page 2895, Public Records of Collier County, Florida. This right of first refusal does not apply to the sale of individual lots.

5. Subject to easements and other matters as shown on the recorded plat of Torino and Miramonte, a subdivision according to the plat thereof as recorded in Plat Book 42, page 51, Public Records of Collier County, Florida.

6. Subject to easements and other matters as shown on the recorded plat of Torino Lot 55 Replat, a subdivision according to the plat thereof as recorded in Plat Book 49, page 59, Public Records of Collier County, Florida.

7. Utility Easement recorded in Official Records Book 3702, page 3741, Public Records of Collier County, Florida.

8. Utility Easement recorded in Official Records Book 3714, page 2380, Public Records of Collier County, Florida.

9. Easement in favor of Florida Power & Light Company in Official Records Book 4090, Page 4173, Public Records of Collier County, Florida.

10. Subject to Right of First Refusal as to sale of all or portion of undeveloped premises described herein to any bona fide third party purchaser pursuant as an arms length transaction, being reserved by Halstatt Partnership in Deed recorded in O.R. Book 3783, page

927, Public Records of Collier County, Florida. This right of first refusal does not apply to the sale of individual lots.

11. Notice of Adoption of Development Order recorded in Official Records Book 1552, page 1457 as modified in O.R. Book 1625, page 1197 and O.R. Book 1625, page 1199, Public Records of Collier County, Florida.

12. Utility Facilities Warranty Deed and Bill of Sale filed 8/6/07 in Official Records Book 4267, Page 543, as affected by Subordination filed 8/6/07 in Official Records Book 4267, Page 548, Public Records of Collier County, Florida.

# EXHIBIT "C"

## BIDDING PROCEDURES

# EXHIBIT "D"

## SALES PROCEDURE MOTION

RM:7317543:6